**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____

|  |  |  |
|---|---|---|
| | ) | |
| **MARK FRAPPIER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 09-cv-11006-DJC** |
| | ) | |
| **COUNTRYWIDE HOME LOANS, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

_____)


### <u>MEMORANDUM OF DECISION</u>

**CASPER, J.**                                                       March 31, 2013

## I.      Introduction

Plaintiff Mark Frappier ("Frappier") alleges that Defendant Countrywide Home Loans, Inc. ("Countrywide") engaged in unfair and deceptive acts in violation of Mass. Gen. L. c. 93A in connection with the processing and approval of a refinancing of a residential mortgage for property located at 26 Matthews Road, Southwick, Massachusetts ("the Property").   Although the basis for this remaining claim has varied at times during the course of this litigation, Frappier essentially alleges that Countrywide fraudulently inflated his income (or should have known that such information was false) on his loan application so that it could qualify him for a mortgage loan that it knew he could not repay.   Frappier further claims that these alleged unfair and deceptive acts caused him injury because he defaulted on the loan, Countrywide foreclosed on the Property, and Frappier lost the value of the payments he had made to Countrywide on the Property for years prior to his default.   After testimony during a two-day bench trial on April 23 and 24, 2012 (and closing arguments on May 24, 2012), the Court now issues its findings of facts and conclusions of

law regarding the c. 93A claim and the unjust enrichment claim, also remaining, and issues judgment in favor of Countrywide.

## II.   Procedural History

On May 11, 2009, Frappier sued Countrywide in Suffolk Superior Court, asserting claims for unjust enrichment (Count I), recission/equitable relief (Count II), breach of the implied covenant of good faith and fair dealing (Count III), unfair and deceptive acts in violation of Mass. Gen. L. c. 93A (Count IV) and negligence (Count V) arising out of Countrywide's alleged "fraudulent and predatory lending practices" with respect to a refinancing of a mortgage on the Property on October 27, 2006 ("the October 2006 Loan").  D. 1-3.[1]  The complaint made no mention of a subsequent mortgage issued by Countrywide to Frappier in December 2006 ("the December 2006 Loan").  D. 1-3.

Countrywide removed the case to this Court (Ponsor, J.) on June 12, 2009.  D. 1.  On April 29, 2010, Countrywide moved for summary judgment on all counts of the complaint.  D. 19. On May 24, 2010, Frappier opposed Countrywide's motion and filed a cross motion for summary judgment against Countrywide, also on all counts.  D. 27.  Countrywide moved to strike the cross motion for summary judgment as it was "grossly untimely" and filed without leave of Court, D. 28 at 1, but also opposed the cross motion on substantive grounds.  D. 31.  After a hearing on the motions on June 9, 2010 and additional, post-hearing briefing, the Court granted Countrywide's motion for summary judgment, denied Frappier's cross motion for summary judgment and denied Countrywide's motion to strike Frappier's cross motion for summary judgment as moot.  D. 38.

---

[1] References to docketed material are abbreviated as "D. __."   References to exhibits admitted at trial are abbreviated as "Exh. __."

In its October 7, 2010 Memorandum and Order granting summary judgment to Countrywide on all counts, the Court addressed Frappier's c. 93A claim. D. 38 at 6-7. The Court recognized that Frappier's contention was that the October 2006 Loan was unfair within the meaning of c. 93A because he alleged that Countrywide knew that he would be unable to repay it. Acknowledging Frappier's reliance upon <u>Commonwealth v. Fremont Inv. and Loan</u>, 452 Mass. 733 (2008), the Court noted that it is true that "a lender may run afoul of Chapter 93A by knowingly setting up a borrower for default." D. 38 at 6. The Court concluded, however, that Frappier "has pointed to no evidence in the record that Defendant had such knowledge or intent. The terms of the refinanced mortgage were on their face favorable to [Frappier]; at the very least they were comparable to the terms of his previous mortgage. [Frappier] himself attributed the default to a number of factors, including increased heating costs and his change in jobs, none of which [Countrywide] could have predicted." D. 38 at 6-7. The Court considered, but dismissed further argument that "the subsequent December loan made default on the October loan more likely and argued that, in determining whether [Countrywide] unfairly offered [Frappier] a loan that ensured his default, the [C]ourt should treat the loans together." D. 38 at 7. However, the Court pointed out that not only was there no evidence before it that the loans "were contemplated as a package," but more fundamentally, "the complaint itself does not refer to the December loan at all." D. 38 at 7. The Court further noted that "even if the two loans were negotiated together, it is still not clear how or why the terms of such a package were rigged to ensure [Frappier's] failure." D. 38 at 7. Accordingly, the Court found that "[Frappier] has produced no evidence that [Countrywide's] conduct was either unfair or deceptive" and it allowed Countrywide's motion

3

for summary judgment as to the c. 93A claim.   The Court also dismissed the unjust enrichment claim since there was no evidence in the record to conclude that Countrywide had reason to believe that Frappier posed a greater risk of default, it could not be said that Frappier's payments to Countrywide unjustly enriched the lender.   D. 38 at 10-11.   The Court also dismissed Frappier's other claims against Countrywide, namely Counts II (rescission/equitable relief), III (breach of the implied covenant of good faith and fair dealing, a claim that Frappier argued pertained to both the October 2006 and December 2006 Loans) and V (negligence).   D. 38 at 8-9, 11-12.

Frappier filed a timely appeal of the October 7, 2010 Memorandum and Order.   D. 40.   In a decision dated July 7, 2011, the Court of Appeals for the First Circuit affirmed the district court's order in part and reversed in part, remanding it for proceedings consistent with its opinion.   D. 42; Frappier v. Countrywide Home Loans, Inc., 645 F.3d 51 (1st Cir. 2011).   The First Circuit affirmed the dismissal of the negligence claim (Count V) in its entirety, the rescission/equitable relief claim (Count II) in its entirety, the breach of the implied covenant of good faith and fair dealing as it pertained to the December 2006 Loan (Count III), but it vacated the dismissal of the c. 93A claim (Count IV), the unjust enrichment claim (Count I) and the portion of Count III that related only to the October 2006 loan.

As to the c. 93A claim, the First Circuit concluded that that the district court's finding that Frappier had not produced evidence that Countrywide knew, should have known or intended to set him up for default through the October 2006 Loan did "not seem to us to justify summary judgment" for the reasons given.   Frappier, 645 F.3d at 55.   The First Circuit reasoned that the fact that the terms of the October 2006 Loan were comparable to the terms of Frappier's previous

mortgage did not mean that Countrywide could not have anticipated Frappier's default since his circumstances were different at the time of the prior mortgage when his wife was a co-borrower who was also an income earner.   Similarly, the appellate court reasoned that Frappier's acknowledgment of various factors (i.e., loss of his job, high cost of oil and other expenses) did not mean that Countrywide should not have recognized at the outset that Frappier was doomed to default.   Id.   Moreover, Countrywide's defenses, upon which the district court did not rely, involved disputed question of material fact that would have to be resolved at trial; namely, that Frappier told Mamuszka that his monthly income was $5563 (the amount that Frappier claimed that Countrywide inflated) and that Frappier signed and acknowledged this income as true at the closing.   Id. at 57.   The First Circuit concluded that Frappier "had at least raised triable issues as to both what Countrywide knew and whether it would have made the loan knowing Frappier's true income" and, therefore, the c. 93A claim should survive summary judgment.   Id.   Given that his unjust enrichment claim (to recover all paid interest on the October 2006 Loan) was "more or less the same as his chapter 93A theory," the appellate court concluded that it should also survive, although it acknowledged that Countrywide had not identified any other basis to dismiss this claim other than the one on which the district court relied, namely, that there was no evidence in the record to conclude that Countrywide had any reason to believe that "Frappier was at a heightened risk of default, so Frappier's payment of interest to Countrywide could not have been unjust."   Id. at 58.

The First Circuit concluded that only the portion of the breach of implied covenant of good faith and fair dealing that pertained to the October 2006 loan should survive and be remanded.   Id.

5

Although understanding Frappier's allegation that Countrywide's disregard for whether he could repay the October 2006 Load led it to "granting him the December 2006 loan, . . . reduc[ing] the equity that he had in the home, increas[ing] the sum of his monthly mortgage payments, and thus increased his risk of default on the October 2006 loan," the First Circuit still cautioned that "[i]t may be debatable whether the state court glosses on the covenant concept make it a third vehicle for Frappier's 'likely to default' theory that underpins the first two claims."   Id.   Nevertheless, it vacated the dismissal of this claim and remanded it with the c. 93A claim and the unjust enrichment claim.   Id. at 59.

Upon remand, this case was transferred from the Western Division and reassigned to this session.   9/16/11 docket entry.   On October 27, 2011, Frappier filed a "conditional" motion to amend his complaint to add factual allegations about the second mortgage, the December 2006 loan.   D. 48.   Although Frappier claimed that such amendment was not necessary since Fed. R. Civ. P. Rule 8 did not require the pleading of every relevant fact, he asked that "if this Court determines that it should have been specifically plead, [Frappier] moves that it be allowed by amendment."   D. 48 at 1.   Countrywide opposed the motion, arguing inter alia, that such an untimely motion after the completion of discovery, summary judgment motions and appeal, particularly where there was no explanation as to the reason for such delay, would prejudice Countrywide and would require re-opening of discovery and the opportunity for another motion for summary judgment and reformulating its defense and trial strategy.   D. 50.   The Court denied Frappier's motion to amend noting that:

Although the standard for amending pleadings under Fed. R. Civ. P. 15(a)(2) is a

6

liberal one, it is not one without bounds.   Acosta-Mestre v. Hilton Int'l of Puerto Rico, Inc., 156 F.3d 49, 51 (1ˢᵗ Cir. 1998) (noting that Rule 15(a)'s liberal amendment policy seeks to serve justice, but does not excuse a lack of diligence that imposes additional and unwarranted burdens on an opponent and the courts). Plaintiff now seeks to amend the complaint to add claims regarding the second mortgage loan he obtained in December 2006 ("second mortgage").   There is no mention of the second mortgage in the complaint.   Now, over two years after he filed the instant complaint and over one year since the Court issued its Memorandum and Order on the parties' cross motions for summary judgment and after the First Circuit has now reversed that order in part and remanded the matter to this Court, Plaintiff seeks to amend the complaint to add claims related to the second mortgage.   Here, [since] there has been undue delay in seeking this amendment and it would unduly prejudice Countrywide to allow amendment now to add claims about the second mortgage, the Court declines to allow the amendment.   Accordingly, Plaintiff's motion to amend the complaint is DENIED.

12/12/2011 docket entry.   Thereafter, the Court held an initial pretrial conference and scheduled this case for final pretrial conference on April 12, 2012 and trial for April 23, 2012. 1/19/12 docket entry.

Prior to trial, Countrywide moved for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c) as to Count III, the claim for breach of the implied covenant of good faith and fair dealing, and to strike the jury demand as this claim was the only remaining that gave rise to a jury trial.   D. 72.   Specifically, Countrywide argued that the complaint failed to allege any facts that would give rise to a claim for breach of the implied covenant of good faith and fair dealing where the alleged wrongful conduct in the complaint by Countrywide predated the October 2006 Loan.   Frappier opposed the motion arguing that the October 2006 Loan was not the start of the wrongful conduct and the contract(s) that gave rise to Count III were the pre-approval paperwork that predated the October 27, 2006 closing on the loan.   D. 78.   The Court heard oral argument on the motion at the

Final Pretrial Conference on April 12, 2012.   4/12/12 docket entry.   Ruling from the bench, the Court granted Countrywide's motion.   As articulated at the hearing, a breach of the implied covenant of good faith and fair dealing has to arise out of a contractual relationship.   AccuSoft Corp. v. Palo, 237 F.3d 31, 85 (1st Cir. 2001) (recognizing under Massachusetts law that "[t]he implied covenant of good faith and fair dealing between parties to a contract provides that 'neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract'" and that "implicit in that definition, and made explicit in our precedent, that the prohibition contained in the covenant applies only to conduct during performance of the contract, not to conduct occurring prior to the contract's existence, such as conduct affecting contract negotiations") (internal citations omitted).   Such was not alleged in the complaint as to this claim.   Even the First Circuit, in remanding the case had expressed doubt about the viability of this claim on the basis of allegations that Countrywide had approved Frappier's loan knowing that he was likely default, Frappier, 645 F.3d at 58.   Although the Court noted that Frappier's factual allegations gave to rise to the c. 93A claim that would proceed to trial, they did not state a plausible Count III, particularly where the allegations regarding any pre-October 2006 Loan oral and written agreement that Frappier's counsel belatedly cited in opposition to Countrywide's motion, were not even alleged in the complaint.   Compare D. 1-3 with D. 78.[1]   As a result of this ruling, the Court dismissed Count III and struck the jury demand

---

[1]To the extent that Frappier argued that the lock-in agreement between Countrywide and Frappier regarding the interest rate for the October 2006 Loan constituted an agreement between the parties giving rise to this claim, Frappier did not explain how Countrywide's alleged conduct could give rise to a breach to the implied covenant of good faith and fair dealing as to this contract and no such allegations were asserted in the complaint.

and set the matter for a bench trial on April 23, 2012.

The Court conducted a bench trial on April 23 and 24, 2012. Frappier testified and he called Lisa Kraus, Home Loans manager at Countrywide (now Bank of America Home Loans). Countrywide called Richard Mamuszka, the loan originator for the October 2006 Loan and Raymond Gendron, the closing attorney for the closing of the October 2006 Loan. Joint Exhibits 1-30 were admitted in evidence at the beginning of trial and Exhibit 31, offered by Countrywide, was admitted during the second day of trial. The Court heard closing arguments from counsel on May 24, 2012.

**III.    Findings of Fact**

**A.    <u>Events Prompting the October 2006 Loan</u>**

1.    Frappier, resides in Southwick, Massachusetts and, in 2006, was 36 years old. Tr. 1-7:5-8.[1] He graduated from high school and took some college courses. Tr. 1-7:9-18. He was a corrections officer for Hampden County until his disability retirement in or about 1997. Tr. 1-8:1-8. After that, he had various part-time jobs including one at Our Lady of the Lake Church providing maintenance and janitorial services. Tr. 1-20:17-21.

2.    The Property had been in Frappier's family for five generations and he had grown up there. Tr. 1-9:15-20. He became the owner of the Property in June 1999, when he bought it from his mother with his wife at the time, Ellen Kramer. Tr. 1-10:2-13; Exh. 25. They

---

[1] References to the transcripts of trial testimony are abbreviated as "Tr. __:__," with the first number representing the day of trial on which the referenced testimony occurred and the second number referencing the specific page (or pages) of the transcript of that day's testimony. The trial transcripts are docketed at D. 99 and D. 100.

purchased it with a mortgage for $88,272 through Countrywide.   Tr. 1-10:23-11:3; Exh. 25.

Frappier and Kramer, took out a mortgage for $99,000 on the Property in March 2001 to finance

home improvements.   Tr. 1-56:5-14; Exh. 26.   Frappier, by himself, took out multiple mortgages

on the Property following his divorce from Kramer, in March 2002, Exh. 27, which increased the

amount of the mortgage on the Property to $118,500, and another in January 2003, Exh. 28, that

increased the mortgage to $144,000.   Tr. 1-12:18-13:25; 1-56:15-51:1; 1-58:1-8.

3.      Frappier received a home equity line of credit ("HELOC") on the Property for

$39,000 in July 2004 from Holyoke Credit Union to finance home improvements.   Exh. 30; Tr.

1-15:13-22.

4.      Frappier and his second wife, Pamela Frappier, took out another mortgage from

National City Mortgage on the Property for $193,000 in June 2005.   Exh. 29; Tr. 1-14:15-24.

Frappier explained that they took out this mortgage to pay off the home equity loan that they had

taken out to do more home improvements.   Tr. 1-58:11-22.   That is, the National City Mortgage

was to pay off the Holyoke Credit Union HELOC.   Tr. 1-59:24-60:1-4.

5.      Frappier and Pamela Frappier, divorced in 2006 with the final agreement dated

March 23, 2006.   Exh. 1.   In relevant part, the agreement required that if the Property was not

sold within 120 days of the agreement, then Frappier agreed to refinance the Property and remove

Pamela Frappier's name from any and all existing mortgages and liens of record within 30 days of

the expiration of the 120-day period.   Exh. 1 at 3.   Accordingly, Frappier had to sell the Property

by July 21, 2006 or refinance the Property by August 20, 2006.   Id.; Tr. 16:18-17:1.   At the time

of the divorce agreement, the Frappiers agreed that the stipulated fair market value of the Property was $250,000.   Exh. 1 at 3.

6.      In the summer of 2006, Frappier planned to sell the Property.   Tr. 1-17:2-10. Frappier hoped to sell it to purchase another property (the "Longyard Road Property") with his girlfriend, Christine Longo ("Longo").   Tr. 1-17: 2-10; Tr. 1-81:18-83:22.

7.      Frappier and Longo planned to sell their respective properties to purchase the Longyard Road Property, which was priced around $420,000.   Tr. 1-82: 20-25.

8.      To purchase the Longyard Road Property, Frappier and Longo applied for financing from Countrywide.   Exh. 4 (Loan Application for Loan #----3177); Exh. 6 (Loan Application for Loan #----3185).   This loan was contingent on Frappier's and Longo's respective properties selling.   Tr. 1-17: 7-10.

9.      In 2006, Countrywide's procedure for processing a loan was as follows:   a loan officer interviewed an applicant to obtain the information required by the loan application; the loan officer then submitted the application information from the applicant to a loan processer; the loan processer completed the loan application file, including ordering title and an appraisal, and then submitted that loan application file to the underwriting department within Countrywide; an underwriter made the decision about whether to approve or decline the loan; and, if approved, the loan would go to the closing department, where the closer would coordinate a closing on the loan with outside counsel.   Tr. 2-65:13-2-66: 9.

10.     Frappier and Longo started the process for financing to buy the Longyard Road Property by contacting Mamuszka to whom Frappier had been referred by a realtor.   Tr. 1-17:12-18:4.

11.     In 2006, Mamuszka was a loan originator/loan officer at Countrywide.   Tr. 2-118: 7-23.   Mamuszka's responsibilities as a loan officer were to seek prospects that sought mortgage loans and to complete mortgage loan applications and submit them.   Tr. 2-118: 25-2-119: 5.   As a loan officer, he was not involved in Countrywide's decision to underwrite a loan.   Tr. 2-125: 11-12.   As a loan officer, Mamuszka acknowledged that he had a duty to submit accurate information based on the information stated by the borrower.   Tr. 2-125:13-22.   According to Mamuszka, no one at Countrywide ever suggested that Mamuszka should provide inaccurate information on an application or inflate a borrower's income to qualify him or her for a loan.   Tr. 2-125:20-2-126:1.   Loan originators, like Mamuszka, are paid on commission.   Tr. 2-60:10-13.

12.     Mamuszka, who would later be involved in the October 2006 Loan in this case, took the applications of Frappier and Longo by phone for the Longyard Road Property in August 2006.   Exh. 4 at 3 (Loan Application for Loan #----3177); Exh. 6 at 3 (Loan Application for Loan #----3185).   When taking those applications, Frappier provided Mamuszka with employment, income, and asset information, which Mamuszka then passed along to Countrywide's loan processor.   Exh. 4 at 2-3; Exh. 6 at 2-3;Tr. 2-123: 5-24; 2-124:11-25.

13.     As to this application, Mamuszka testified that Frappier told Mamuszka that he made $5,563 as his base monthly employment income.   Exh. 4 at 2; Exh. 6 at 2; Tr. 2-123:16-24.

12

14.     Mamuszka testified that he did not inflate the figures that Frappier provided to him, Tr. 2-127:9-11, and he also did not look at any other source to get his job title and that information as well came from Frappier.   Tr. 2-124:6-8.

15.     Frappier testified that Mamuszka told him and Longo to bring certain records—two years of tax returns, pay stubs for proof of employment and a couple months' bank statements when they spoke about the possible financing of the Longyard Road Property in July 2006.   Tr. 1-18:15-19:6; 1-20:2-9.   According to Frappier, when they met with Mamuszka, they brought him the requested documents.   Tr. 1-20:8-16.

16.     At trial, Frappier testified that he told Mamuszka that he made only $3,300 per month, Tr. 1-26:11-17 (testifying that he told Mamuszka that his "retirement income, plus a part-time job at Our Lady of the Lake Church, which was $1,200 a month"); Tr. 1-24:10-16 (attorney proffer that Frappier would testify that his retirement disability income was $2,100 per month and that he told Mamuszka that he made $3,200 per month).   However, the December 1, 2008 letter 93A demand letter on Frappier's behalf from his original counsel ("Saia Letter") indicated that Frappier "stated [to Mamuszka] that he earned $300/week" at the Church and that Mamuszka "changed that to over $3000/month."   Exh. 8 at CHL-FRAP000242; Tr. 1-99:3-20. A later 93A demand letter from Frappier's current counsel on March 24, 2009 letter ("Diviacchi Letter") did not claim that Frappier provided any income figure to Mamuszka, but instead claimed that Frappier submitted income verification documentation to Mamuszka that contradicted the $5,563 figure.   Exh. 2 at 2.

17.     The loan program for which Frappier and Longo applied to purchase the Longyard Road Property was a stated income/stated asset loan ("SISA loan") program, also known as the Fast and Easy loan program.   Exh. 4 at 1 (Loan Application for Loan #----3177) (describing loan type as "Conf Fixed 30 Fast & Easy Loan").   This program was designed to provide qualifying applicants (those with credit scores at or above 680, verified employment, and a loan to property value less than 80%) with a fast approval and closing.   Tr. 2-66:11-18; 2-92: 14-20.   To facilitate a fast approval process and closing for this group of qualified applicants, the program did not require the borrower to document his income or assets.   Tr. 2-34:23-2-35:5; 2-119:16-120:10.

18.     As noted above, Frappier claimed at trial that, as part of the loan application for the Longyard Road Property, he provided Mamuszka with a file of income verification documents – two years' worth of tax filings, pay stubs, and bank statements.   However, the Fast and Easy loan program for which Frappier and Longo applied on the Longyard Road Property required only that Frappier state his income, not provide documentation to verify same.   Tr. 2-34:23-35:5; Tr. 2-66:10-23; 2-119:18-120:2.   Given the nature of the loan product, Mamuszka testified that if Frappier had provided income verification documents, Mamuszka would not have accepted them. Tr. 2-127:3-8.

19.     Although Frappier did testify that he provided such income verification documents, these documents were not offered at trial.   Frappier testified that the folder of income verification documents was thrown away.   Tr. 1-73:6-20.

20.     Countrywide, printed and mailed initial disclosures to Frappier and Longo on September 1, 2006, three days after the applications were submitted by phone.   Exh. 3 at

14

CHL-FRAP001018-47 (disclosures showing printed date of "09/01/2006"); Tr. 1-93:20-24; Tr. 2-67:5-13. Those initial disclosures included the loan application listing the monthly income figure of $5,563 for Frappier. Exh. 3 at CHL-FRAP001018-21 (Loan Application for Loan #----3177).

21. Although Frappier received a folder of documents from Countrywide regarding this loan, he testified that he "never really went through it." Tr. 1-93: 20-21.

22. Longo sold her property, but Frappier did not sell the Property. Tr. 1-30:20-24; 1-86:7-11. As such, the loan, applied for by Frappier and Longo in August 2006, never closed and was not funded because they withdrew their loan application. Exh. 3 at CHL-FRAP000947.

23. Because Frappier did not sell the Property by July 21, 2006 or refinance it by August 20, 2006, he was in breach of the divorce agreement. Tr. 1-84: 6-1-85:7; Tr. 1-86:4-22; Exh. 1 at 3.

24. As he acknowledged, given the terms of the divorce agreement, by September 2006, Frappier had to refinance as quickly as possible. Tr. 1-31:6-10; 1-39:17-22; 1-86:23-1-87:6.

**B.    Countrywide's Processing of the October 2006 Loan**

25. Countrywide processed Frappier's October 2006 Loan application in much the same way as the earlier application in August. Tr. 2-65:13-2-66:9; Exh. 8 (Loan File for Loan #----8599).

26. On or around September 19, 2006, Frappier applied for the October 2006 Loan and provided Mamuszka by telephone with employment, income, and asset information for the

October 2006 Loan, which Mamuszka submitted to Countrywide's loan processor.   Exh. 9 at 2-3 (Loan Application for Loan #----8599); Tr. 2-121:21-122:3; Tr. 2-123:19-24; Tr. 2-124:9-125:12.

27.     Mamuszka testified that Frappier again told him that he made a base monthly employment income of $5,563, the same figure that he had provided for the earlier loan application.   Exh. 9 at 2-3; Tr. 2-123:19-24; Tr. 2-124:9-125: 12.

28.     Frappier denied that he told Mamuszka or anyone at Countrywide that his income was around $5,000 per month.   Tr. 2-14:22-15:3.

29.     Mamuszka testified that he did not inflate the figures that Frappier provided for the October 2006 Loan application or any other loan application.   Tr. 2-127:9-11.   With stated income loans, Mamuszka testified that he would ask a borrower questions and would record their answers regarding the loan application.   Tr. 2-122:7-11.

30.     Like the loan application for the Longyard Road property, the loan program for which Frappier applied for the October 2006 Loan on the Property was a stated income loan program, also known as the Fast and Easy loan program.   Exh. 9 at CHL-FRAP000386 (describing Loan #----8599 as "Conf ARM LIBR 3/1 226 F&E10y10"); Tr. 2-126: 25-2-127: 8.

31.     When Frappier applied for the October 2006 Loan, he had a credit score of 697 and the loan to value ratio was 78.96%.   Exh. 13 at CHL-FRAP000222.   Thus, his application met the requirements of the Fast and Easy program, with one exception that arose after application and is described below.

32.     Pursuant to the terms of the Fast and Easy loan program, Frappier was not required to submit any income verification documentation, such as tax returns, W-2s, or pay stubs, to

16

Countrywide for the October 2006 Loan.   Tr. 2-126:18-2-127:8; Exh. 8 (Loan File for Loan #----8599).

33.     Mamuszka testified that he did not request or rely on any income verification documentation from Frappier in completing or submitting Frappier's application for the October 2006 Loan.   See Tr. 2-124:4-8; 2-127:3-8.

34.     Instead of requiring documented income verification, a stated income loan program, like the Fast and Easy loan program, required a borrower to verify under criminal penalty that the income and asset information that he provided was accurate.   Exh. 15 (Final Loan Application for Loan #----8599) at 3-4; Tr. 2-69:17-2-70:18.

35.     On September 22, 2006, a Countrywide loan processor (not Mamuszka) completed the preliminary Loan Application based on the income and asset information provided by Frappier to Mamuszka.   Exh. 9 (Preliminary Loan Application for Loan #----8599, printed on 9/22/2006); Tr. 2-46:9-18.   The Countrywide processors sent this application to the borrower in the normal course within three days and there was no reason to believe that the normal process was not followed as to Frappier as to the application for the October 2006 Loan.   Tr. 2-67:3-13.

36.     In 2006, there was no requirement that the borrower sign the preliminary application and return it to Countrywide for a loan to be processed.   Tr. 2-88:4-9.

37.     Mamuszka was not involved in the preparation of the preliminary application for the October 2006 Loan or sending it to Frappier.   Tr. 2-46:9-18; Tr. 2-125:3-12.

38.     The preliminary application for the October 2006 Loan showed Frappier's base monthly employment income was $5,563 and listed his job title as "Operations Mana/Management."   Exh. 9 at CHL-FRAP000386.

39.     Once Mamuszka or his assistant relayed Frappier's income and asset information to the loan processor at Countrywide, Mamuszka had nothing more to do with Frappier's loan application for the October 2006 Loan.   Tr. 2-66:3-9; Tr. 2-124:9-21; Tr. 2-125:3-12. Mamuszka did not prepare or review the initial application or any disclosure that was sent to Frappier on September 22, 2006, or any closing document that Frappier signed at the October 27, 2006 closing.   See, Tr. 2-46:9-18.

40.     The loan processor populates the loan application forms with the information from the borrower and the application is sent to the borrower for his review prior to the closing.   Tr. 2-69:8-19.   This process is to allow a borrower to correct any information before the final documents are drawn up for the closing.   Tr. 2-69:23-70:13.   If the borrower brought an error to Countrywide's attention, it would redraw the documents for the closing.   Tr. 2-74:23-75:2.

**C.     The Underwriting Of the October 2006 Loan**

41.     Countrywide issued Frappier the October 2006 Loan.   Exh. 13; Exh. 9 at CHL-FRAP000387; Exh. 15 at 2.   The base monthly employment income figure listed in Frappier's application, $5,563, passed a reasonability test.   Exh. 8 at CHL-FRAP000461 (CMD Quality Verification & Documentation Questionnaire (QVDQ)).

42.     Although Frappier originally applied for a Fast and Easy loan, during the underwriting process Countrywide learned that Frappier has listed the Property for sale in the prior

18

six months.  This development precluded Countrywide from underwriting the October 2006 October 2006 Loan as a Fast and Easy conforming loan.  Tr. 2-72:12-16; Tr. 2-139:9-18; Tr. 2-146:7-9.

43.     Instead, Countrywide was able to underwrite the October 2006 Loan as an expanded criteria stated income loan.  Because it was still a stated income loan product, Countrywide used the information Frappier had submitted by telephone to Mamuszka on September 19, 2006.  Tr. 2-72:21-24; Tr. 2-139:14-18; Tr. 2-147:6-17.

44.     The October 2006 Loan had the following features:  it was in the amount of $189,000 secured by a mortgage on the Property; a term of 30 years; a fixed/adjustable interest rate, known as a 7/1 Adjustable Rate Mortgage (i.e., so that for the first seven years, the interest rate was fixed at 6.875%, but the rate would be adjusted in the seventh year based on the LIBOR rate plus a margin of 2.250% so that the rate could go no higher than 11.875% and no lower than 2.250%); a prepayment penalty that expired after one year; a LTV ratio of 78.96% and a DTI ratio of 43.64%.  Exh. 8 at CHL-FRAP000427-28 (Fixed/Adjustable Rate Note), CHL-FRAP000459 – CHL-FRAO000460 (Prepayment Penalty Addendum); Exh. 13 at CHL-FRAP000222 (Uniform Underwriting and Transmittal Summary).

45.     Countrywide verified that Frappier's credit score was over 680, that he was employed by the church in operations, that he had been employed for three years.  Exh. 12 (Structured Loan Desk Exception Summary) (listing credit score of 697); Exh. 8 at CHL-FRAP000461 (CMD Quality Verification & Documentation Questionnaire (QVDQ)); Tr. 2-59:1-5.

19

46.     In determining whether to underwrite the October 2006 Loan, Countrywide used its automated underwriting system named "CLUES," which mirrors the guidelines of Federal National Mortgage Association, also known as Fannie Mae, and Federal Home Loan Mortgage Corporation, also known as Freddie Mac.  Tr. 2-81:1-12.  The CLUES system calculates the ratios of the loan based on the information provided by the borrower and then states what conditions need to be met for the loan.   Tr. 2-32: 5-19.

47.     Based on the $5,563 base monthly employment income figure, Countrywide calculated the debt-to-income ratio, or DTI, on the October 2006 Loan to be 43.64%.  Exh. 13 (Uniform Underwriting and Transmittal Summary).  That DTI met the qualifying DTI for that particular loan program, which was 50%.  Tr. 2-37:11; Tr. 2-75:20-25.  If Frappier was only making $3,300 per month, he would not have met the DTI for the October 2006 Loan.  Tr. 2-38:8-11.

48.     Kraus testified that on the Amortization Schedule, Countrywide made a projection of what the adjusted rate would be after year seven.   Tr. 2-82:3-2-83:12; Exh. 8 at CHL-FRAP000337 (Amortization Schedule dated October 27, 2006).   That estimated fully indexed rate was 7.625%, which is less than one full percentage point above the introductory interest rate.  Compare Exh. 8 at CHL-FRAP000337 (Amortization Schedule dated October 27, 2006 showing 7.625% interest rate after 7 years) with Exh. 15 at 1 (showing introductory interest rate of 6.875%).

49.     Countrywide also calculated the loan-to-value ratio, or LTV, which is the percentage of value of the Property that was secured by a lien.   The qualifying LTV guideline for

Frappier's October 2006 Loan was 80% or less.   Tr. 2-66: 11-18.   In this case, Frappier's LTV was 78.96% and therefore met the qualifying guideline.   Exh. 13 (Uniform Underwriting and Transmittal Summary).

50.    The value of the Property used to calculate the LTV was based on an appraisal of $240,000 conducted in October 2006 and provided by an independent, licensed, third-party appraiser.   Exh. 8 at CHL-FRAP000435-38 (Appraisal of Real Property).

51.    Underwriters at Countrywide are paid a salary and pooled bonus, the latter of which is based on the number of closings.   Tr. 2-60:25-61:8.

**D.    The Closing For the October 2006 Loan**

52.    Frappier attended the closing on the October 2006 Loan.   Tr. 1-33:2-34:14.   At the closing on October 27, 2006, Frappier reviewed the application with the closing attorney, Gendron, and then executed and initialed the application.   Exh. 15 (Loan Application for Loan #----8699 signed 10/27/2006); Tr. 2-155:15-156:20.

53.    Gendron, the closing attorney on the October 2006 Loan, testified that he represented Countrywide at the closing, but believed that he had an attorney/client relationship with the borrower as well, Tr. 2-160:1-8; Tr. 2-156: 25-157:9; Tr. 2-162:4-7, and that he was looking out for the borrower's interests.   Tr. 2-157:3-20.   Frappier testified that he believed that Gendron was representing him.   Tr. 1-34:24-35:3.

54.    Although he had no specific recollection of the closing of the October 2006 Loan, Gendron testified about his standard practices in 2006 regarding loan closings and that he had no reason to believe that he had deviated from those practices for the closing of the October 2006 Loan.   Tr.

21

2-152:13-21;  2-161:23-162:3.   Gendron's standard practice was to explain each closing document to the borrower and review specific information in the closing documents before the borrower signs or initials a document.   Tr. 2-152:21-153:18.   When reviewing the Uniform Residential Loan Application, Gendron ensured that the borrower verified the borrower's employer, the length of employment, and the income figures to make certain that the borrower's situation has not changed in the time between the initial application and the closing.   Tr. 2-156:1-20.   Gendron also developed a practice of reviewing the loan application information in detail because sometimes the documents contain mistakes.   Tr. 2-153:24-154:1; Tr. 2-159:3-8; Tr. 2-155:11-156:5.   Gendron related how, in his experience, sometimes closing loan applications reflected the wrong interest rate or credit card balance.   Tr. 2-153:24-154:1; Tr. 2-159:3-8; Tr. 2-161:2-4.

55.   Frappier described the closing of the October 2006 Loan as "[s]ame as all the others [i.e., other closings], sign here, initial this, sign that, initial this."   Tr. 1-34:15-19.   When asked if he had the opportunity to read anything at the October 2006 Loan closing, Frappier replied that "I've never read anything in a closing in my life, sir."   Tr. 1-34:20-23.   By signing the application at closing, Frappier signed and swore under criminal penalty that the information contained in the application, including his base monthly employment income, was accurate:

> Each of the undersigned specifically represents to Lender and Lender's actual or potential agents, brokers, processors, attorneys, insurers, servicers, successors and assigns and agrees and acknowledges that: (1) the information provided in this application is true and correct as of the date set forth opposite my signature and that any intentional or negligent misrepresentation of this information contains in this application may result in civil liability, including monetary damages, to any person who may suffer any loss due to reliance upon any misrepresentation that I have made on this application, and/or in criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Sec. 1001 et seq.; . . . (4) all statements made in this application are made for the purpose of obtaining a residential mortgage loan; . . . (7) the Lender and its agents, brokers, insurers, servicers, successors, and assigns may continuously rely on the information contained in the application, and I am obligated to amend and/or supplement the information provided the information provided in this application if any of the material facts that I have represented herein should change prior to closing of the Loan . . . .

> \*        \*        \*

> I/We fully understand that it is a Federal crime punishable by fine or imprisonment, or both, to knowingly make any false statements concerning any of the above facts as applicable under the provisions of Title 18, United States Code, Section 1001, et seq.

Exh. 15 at 3-4 (Uniform Residential Loan Application for Loan #----8599 signed 10/27/2006).

56.    Along with the application, Frappier also received a Borrower's Certification.   In executing this Certification on October 27, 2006, Frappier signed and certified that he had provided correct information with respect to the loan application, including the $5,563 base monthly employment income figure:

> 1. . . . In applying for the loan, I/we completed a loan application containing various information on the purpose of the loan, the amount and source of the down payment, employment and income information, and assets and liabilities.  I/We certify that all of the information is true and correct.  I/We made no misrepresentations

23

in the loan application or other documents, nor did I/we omit any pertinent information. . . .

\*　　\*　　\*

3. I/We fully understand that it is a Federal crime punishable by fine or imprisonment, or both, to knowingly make any false statements when applying for this mortgage, as applicable under the provisions of Title 18, United States Code, Section 1014.

\*　　\*　　\*

Exh. 16 at CHL-FRAP000354.

57.　　A signed application and Borrower's Certification were required for Countrywide to close the October 2006 Loan.　Exh. 15; Exh. 16; Tr. 2-69:20-70:18.

58.　　The initial and final application, the latter having been signed by Frappier at the closing, both listed the same base monthly employment figure, $5,563.　Exh. 9 at CHL-FRAP000387 (Preliminary Loan Application for Loan #----8599 printed 9/22/2006); Exh. 15 at 2 (Loan Application for Loan #----8599 signed 10/27/2006).

59.　　Frappier received all the required disclosures prior to the closing, signed and initialed all the required disclosures at closing, and then received copies of all the disclosures he signed and initialed at closing from Gendron after the closing.　Tr. 2-67:1-13; Tr. 2-76:7-2-83:12; Tr. 2-154:7-2-155:4.　Specifically, Frappier received the Good Faith Estimate, Exh. 8 at CHL-FRAP000395-96; Tr. 2-76:11-21; the Preliminary and Final Truth In Lending Disclosure Statements, Exh. 8 at CHL-FRAP000397-398; Exh. 8 at CHL-FRAP000379-380; Tr. 2-76: 22-2-77:20; two Itemization of Amount Financed documents, Exh. 8 at CHL-FRAP000381, 399; Tr. 2-77: 21 – 2-78: 15; an initial and final Uniform Residential Loan Application.　Exhs. 9, 15;

24

Tr. 2-78:16-24; the Notice of the Right to Cancel, Exh. 8 at CHL-FRAP000431-32; Tr. 2-78:25-2-79:9; the opt-out notice, Exh. 8 at CHL-FRAP000295-301; Tr. 2-79:10-25; the Disclosure Statement About MERS, Exh. 8 at CHL-FRAP000336; Tr. 2-80:1-11; and a Servicing Transfer Disclosure.   Exh. 8 at CHL-FRAP000351-52; Tr. 2-80:12-24.

60.     To the extent Frappier claims that he did not receive required disclosures in connection with the October 2006 Loan, Frappier testified that he would not have reviewed the disclosures if he had received them.   Tr. 1-34:21; Tr. 1-93:20-21.

61.     Although his counsel described Frappier as "barely literate" during a pretrial conference on April 12, 2012, Frappier had graduated from high school, taken college courses and successfully completed the corrections officer academy.   Tr. 1-7:10-19; 1-52:22-1-53:9.   The Court also notes that when confronted with his counsel's description of him as "barely literate," which he had not been present to hear, Frappier was seemingly insulted.   Tr. 1-53:10-54:3.

62.     Frappier testified that in regard to the multiple mortgages that he had received and multiple closings in which he had participated for those transactions prior to the closing on the October 2006 Loan, he testified that he never read the mortgage documents, that he merely "showed up at the closings and I signed here, initialed this, signed that, initial that, and you walk out the door," but he did acknowledge that some of the lenders had send him some of the documents in advance of the closing.   Tr. 1-61:6-1-62:10; 1-63:14-19.   On one such occasion when he did receive a closing document in advance, he noted that he had found an error in one of the closing documents.   Tr. 1-62:5-63:3; 1-120:22-122:5.

25

63.     After the closing, Gendron sent a copy of the closing documents to Frappier on November 2, 2006.   Tr. 2-154:15-155:4.

**E.      Frappier's Income Was The Same On Multiple Loan Applications in 2006**

64.     From September 2006 until December 2006, Frappier received six Uniform Residential Loan Applications for potential or closed Countrywide loans.   Exhs. 4, 6, 9, 15, 20 at CHL-FRAP000803-06, and 21.   Each of those applications listed his base monthly employment income as $5,563.   Id.   Frappier signed two of the six applications:   for the October 2006 Loan and the December 2006 Loan.   Exhs. 15 (signed 10/27/06) and 21 (signed 12/13/06).   All of these applications that listed Frappier's social security income, listed that income as $2,656.25, except those applications relating to the December 2006 Loan.   Exhs. 4, 6, 9, 20 at CHL-FRAP000803 – CHL-FRAP000806, and 21.   The December 2006 Loan applications listed a different amount of social security income, $3320.31, an amount for the social security income that was "grossed up" by 25%, which was permitted under guidelines because the social security income was not taxed.   Exh. 21 at 2; Tr. 2-54:15-24; Tr. 2-64:15-23.   The only application that did not list social security income was Exh. 15, the final application, signed by Frappier, for the October 2006 Loan.   Exh. 15.

65.     From September 2006 until December 2006, Frappier received six Borrower's Certification and Authorization forms.   Exhs. 3 at CHL-FRAP001028, 5 at CHL-FRAP000575, 14, 16, 20 at CHL-FRAP000843, 20 at CHL-FRAP000838.   Frappier signed three of the six thus verifying and certifying that the information he provided in the loan applications was true and

correct.   Exhs. 16 (signed 10/27/06), 20 at CHL-FRAP000843 (signed 12/5/06), 20 at CHL-FRAP000838 (signed 12/13/06).

66.   After the closing of the October 2006 Loan, Frappier dealt with Mamuszka again to acquire a second mortgage on the Property, the December 2006 Loan.   Tr. 1-35:19-36:5; Exh. 21. Frappier testified that Mamuszka suggested that he seek two mortgages, the October 2006 Loan and the December 2006 Loan, and that later "down the road in a couple of years we'll roll them both into one, and we'll get you better rates and stuff."   Tr. 1-38:15-24.   Although he only wanted one mortgage, he agreed to Mamuszka's suggestion.   Tr. 1-38:15-39:3.

**F.**   **After Closing On the October 2006 Loan, Frappier Has Financial Difficulties**

67.   Although it was not easy for him to do so, Tr. 1-40:14-41:2, Frappier successfully made the scheduled monthly payments on the October 2006 Loan for fifteen, consecutive months. Exh. 19 (Loan Administration for Loan #----8599); Tr. 2-4:13-5: 7.   He did not miss a payment on the October 2006 Loan between fall of 2006 and the winter of 2008.   Exh. 19.

68.   A little over a year after he entered into the October 2006 Loan, Frappier started having difficulty making the payments on the October 2006 Loan.   Tr. 2-5:24-6: 3.

69.   In 2008, Frappier changed jobs with the intention of making more money at a new job.   However, Frappier ended up being let go by his new employer.   Tr. 2-6:4-14.

70.   Frappier was also burdened by unexpectedly high heating bills for the winter of 2008.   Tr. 2-6:15-25.

71.   During the winter of 2008, Frappier also had numerous troubles with his truck, requiring expensive repairs.   Tr. 2-7:1-6.

27

72.     In the winter of 2008, Frappier also suffered illness that kept him out of work and hospitalized him for a day.   Tr. 2-7:7-23.

73.     As Frappier acknowledged, none of these financial hardships were predictable. Tr. 2-7: 24-2-8: 5.

74.     In the winter of 2008, Frappier again tried to sell the Property and it was initially on the market for $229,000, Tr. 2-9:21-10:7, but it did not sell.   Tr. 2-10:9-14.

75.     Because of his delinquency in making payments, Countrywide foreclosed on the Property. Tr. 1-47:15-16.   Frappier testified to the mental and physical effect about the stress of making the monthly payments on the October 2006 Loan and the subsequent foreclosure on the Property.   Tr. 1-46:5-47:15; 1-49:6-18.

## G.     The Value Of the Property and Frappier's Lack of Equity in the Property

76.     When Frappier purchased the Property in 1999, he did so without any equity. Tr.1-9:25-1-10:22; Tr. 1-55:23-1-56:4.   In the nine years he owned the Property, Frappier had increased the mortgage loans encumbering the Property to the point where at the time of foreclosure the Property was encumbered by $228,000 in debt obligations.   Exh. 8 at CHL-FRAO000259 – CHL-FRAP000274 (Mortgage for Loan #----8599) and Exh. 20 at CHL-FRAP000682 – CHL-FRAP000689 (Mortgage for Loan #----5591).

77.     In 2008, Frappier attempted to refinance the Property and an appraisal was done. The appraisal, dated July 10, 2008, by a licensed appraiser determined that the fair market value of the Property was $205,000.   Exh. 8 at CHL-FRAP000494-514.

28

78.     Frappier tried to sell the Property in 2008 for $229,000 but was unsuccessful in doing so.   Tr. 2-10:3-14.

79.     Although the 1099-A issued by Countrywide listed the Property with a fair market value of $359,604.28, Exh. 24, Frappier testified that he did not believe that this was the fair market value of the Property.   Tr. 2-9: 13-16.

**H.     The c. 93A Demand Letters And Countrywide's Response**

80.     Frappier's counsel sent Countrywide two demand letters pursuant to c. 93A, one on December 1, 2008, the Saia Letter, and one on March 24, 2009, the Diviacchi Letter.   Exh. 8 at CHL-FRAP000242 (Saia Letter); Exh. 2 (Diviacchi Letter).   The Diviacchi Letter did not claim that Frappier made any statement to Mamuszka about his income.   Instead, the Diviacchi Letter claimed that Frappier submitted income verification documentation to Mamuszka.   Exh. 2.

81.     Countrywide investigated the claims Frappier made in his Chapter 93A letter and responded by letter, dated June 12, 2009, informing Frappier's counsel that Countrywide's records demonstrated that:   (1) the required disclosures were mailed on September 22, 2006; (2) because of the loan product, the borrower was no required to provide income verification documentation; (3) Frappier signed the loan application certifying that the information in it was true and correct; and (4) at no time was the lender aware of discrepancies regarding the information contained in the loan application.   Exh. 23.

**IV.   Conclusions of Law**

> **A. Frappier Has Failed to Show that Countrywide Committed Any Unfair or Deceptive Act**

82.     At base, Frappier contends that the loan originator, Mamuszka, overstated his income and Countrywide failed to determine that the stated income was overstated and that conduct constituted an unfair and deceptive act which caused him to default and led to the foreclosure of the Property.

83.     Mass. Gen. L. c. 93A prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce."  Mass. Gen. L. c. 93A, §§ 2, 9.  To prevail on a c. 93A claim, Frappier must show that Countrywide engaged in an unfair or deceptive act and, as a result, he was injured.  Morris v. BAC Home Loan Servicing, L.P., 775 F. Supp. 2d 255, 259 (D. Mass. 2011) (quoting Brandon Assocs., LLC v. FailSafe Air Safety Sys. Corp., 384 F. Supp. 2d 442, 446 (D. Mass. 2005)).   Which acts or practices are "unfair" under c. 93A, depends on "(1) whether the practice . . . is within the penumbra of a common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [and] (3) whether it causes substantial injury to consumers."  Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc., 412 F.3d 215, 243 (1st Cir. 2005).  "Which acts will be considered 'deceptive' [under c. 93A] is less clearly defined in the case law [but] some cases have held that an act or practice is deceptive 'if it could reasonably be found to have caused a person to act differently from the way he or she otherwise would have acted.'"  Incase Inc. v. Timex Corp., 488 F.3d 46, 57 (1st Cir. 2007) (quoting Aspinall v. Philip Morris Cos., 442 Mass. 381, 394 (2004).  "The term 'goes far beyond the scope of the common law action for fraud and deceit.'"  Id. (quoting Slaney v. Westwood Auto, Inc., 366 Mass. 688, 703 (1975).

84.     To demonstrate that Countrywide committed unfair or deceptive business practices in violation of Chapter 93A, Frappier must prove not only that he was issued a stated income loan based on false income information, but also that Countrywide knew or should have known that his income was false and in some fashion encouraged or tolerated his false representations.  See Commonwealth v. Fremont Inv. & Loan, No. 07 4373-BLS1, 2008 WL 517279, at *11 (Mass. Super. Ct. Feb. 26, 2008), aff'd, 452 Mass. 733 (2008); Commonwealth v. H&R Block, Inc., No. 08 2474-BLS1, 2008 WL 5970550, at *10 (Mass. Super. Ct. Nov. 24, 2008).   That is, that Countrywide's origination of the October 2006 Loan was "the origination of a home mortgage loan that the lender should [have] recognize[d] at the outset the borrower [was] not likely to be able to repay."   Fremont, 452 Mass. at 749.   It is not sufficient, however, for Frappier to prove that Countrywide or its agents were merely negligent in some way.   See, e.g., Darviris v. Petros, 442 Mass. 274, 277 (2004) ("a violation of G.L. c. 93A requires, at the very least, more than a finding of mere negligence").

### 1.     There Has Been No Showing, by a Preponderance of Evidence, that Countrywide Knew Frappier's Income was False

85.     The mere fact that the October 2006 was a stated income loan cannot be the basis for Chapter 93A liability.   Stated income loans have not been deemed illegal, unfair, or deceptive as a matter of law.   See Fremont Inv. & Loan, 452 Mass. at 749 (relying upon four features of Fremont's loans that could plausibly given rise to a c. 93A claims).   Stated income loan products, such as the Fast and Easy loan program for which Frappier applied, were designed to provide an efficient way for well-qualified borrowers, such as Frappier, to obtain a mortgage loan.   The

program required borrowers to state their income accurately and verify its accuracy under criminal penalty.

86.     While Frappier now claims that the $5,563 income figure is false, the fact that Countrywide issued a loan based on incorrect income in the application cannot, without much more, create a claim for liability under c. 93A.   Frappier must prove that Countrywide knew, or should have known, that the $5,563 was inaccurate.   He has failed to do so.

87.     At trial, Frappier claimed that he was unaware of the incorrect income on his loan applications because he had a practice of purposely not reading any disclosure document or closing document for any of the mortgage loans discussed during this case.   Based upon the evidence at trial, however, the Court finds that Frappier reviewed and verified the false information on his application for the October 2006 Loan, including the $5,563 gross monthly income figure.   At the closing, an attorney, Raymond Gendron, who both Frappier and Gendron believed was representing Frappier, reviewed with Frappier all the information listed on the loan application that Frappier now claims is inaccurate.   Gendron conducted this review of the loan application with Frappier because he believed that he was acting in Frappier's interests and, in his experience and as might be expected, sometimes the loan documents contained mistakes.   If a mistake was found by a borrower at that point in the process, Gendron could work with the lender to correct any errors.   This was important to Gendron because he wanted to make sure that Frappier, who was signing off on the application under threat of criminal penalty, would not misrepresent something on the application.

88.     After Gendron's review of the information on the loan application, Frappier initialed and signed the application in multiple places, including the page that contained the $5,563 figure.   By initialing and signing, Frappier verified that the information contained in the application was completely accurate.   See Hull v. Attleboro Sav. Bank, 33 Mass. App. Ct. 18, 24 (1992) (noting that "[o]ne who signs a writing that is designed to serve as a legal document, . . . is presumed to know its contents").   He did this knowing that any misstatements were punishable as a crime.

89.     The Court also notes that by the time he applied for the October 2006 Loan, Frappier was a seasoned mortgagor.   Prior to the October 2006 Loan, Frappier had taken out multiple mortgage loans, where he was fully involved in the process from application through closing.   Frappier even observed that, on one occasion with respect to a mortgage loan unrelated to this case, he found an error on the closing documents—despite his purported practice of not reading any mortgage-related documents whatsoever.   In other words, Frappier knew the mortgage loan process, knew he was supposed to verify information in the mortgage loan documents and did so here as he had done before.   There was also no evidence offered at Frappier at trial to suggest that there was any part of Frappier's history as a mortgagor that would suggest to Countrywide that he would be likely to default on the October 2006 Loan.   There was no evidence that he was a loan risk, whether he had a co-borrower or not, where he had consistently presented as a prospect who qualified for the stated loan program and whose income had been provided and confirmed by him as $5,563 for a previous Countrywide loan application (for the Longyard

Property) and the loan applications for the October 2006 Loan and the subsequent December 2006 Loan.   Exh. 31 (comparing income figure of $5,563 provided for all of these applications).

90.     Moreover, aside from the loan application that he signed at closing on the October 2006 Loan, Frappier had seen the information on the loan application for the October 2006 Loan, particularly the $5,563 figure, before.   Prior to the closing on the October 2006 Loan, Frappier had received three disclosures containing loan applications with virtually the same information. On each application the $5,563 gross monthly income figure appeared unchanged.

91.     Even after the closing on the October 2006 Loan, Frappier continued to receive information with the income figure that he alleges is incorrect.   At the closing on the December 2006 Loan, Frappier signed yet another loan application listing the same base gross monthly income he now claims is incorrect.[2]

92.     At most, the evidence shows that Frappier saw the $5,563 income figure as he had multiple opportunities to review same.   The Court cannot say on this record whether Frappier purposely inflated his income or he noticed the mistake and decided to be willfully blind about it because he needed the refinancing under the October 2006 Loan as soon as possible to comply with the divorce agreement.

---

[2]While Frappier tried to make much of the alleged differences between the total income figures on the loan applications, there were no unwarranted discrepancies.   The final application for the October 2006 Loan did not include Frappier's social security income because it was not necessary for him to qualify for the loan and would have taken the loan out of a stated income program, which would have cause additional delay in closing the loan, delay that Frappier wanted to avoid.   The December 2006 application contained a "grossed up" social security figure, which was permitted under guidelines.

93.      Neither Mamuszka nor Countrywide had any reason to know that Frappier's income was not accurate, if it even was.  The Court does not credit Frappier's claim that he submitted income verification documentation to Mamuszka allegedly showing income different than $5,563 or that he told Mamuszka that he made $3,300 per month, not $5,563, in gross monthly income.   No income verification documentation was ever required for any of the loans for which Frappier applied.   Frappier's loans were stated income loans requiring only that Frappier state, confirm and swear to his income.   Therefore, no one at Countrywide requested, expected or accepted income verification documentation for any of Frappier's stated income loans.[3]

94.      Frappier's claim about providing a folder of income verification documentation is, at best, a failure of Frappier's memory. There was no offer of these documents at trial to say what, if anything, they purported to state regarding his income.   While Frappier claims that folder of income verification documents was thrown away by his relatives when he was moving out of the Property, Frappier could have sought to introduce a bank statement, a pay stub, a Form W-2 or other document--that would presumably still be available to offer even if Frappier's copies of same had been inadvertently destroyed--that showed his income, but he did not do so.

95.      Both Mamuszka and Kraus testified that Mamuszka, as a loan officer, was not involved in the underwriting decision-making process.   Once Mamuszka entered the information

---

[3]In closing argument and his proposed findings of fact, counsel for Frappier tried to make much of the fact that Mamuszka hesitated and did not initially answer truthfully a question about discussing anything beyond scheduling with defense counsel in preparation for his trial appearance.   Tr. 2-130:1-15; 2-132:17-133:8; D. 102 at 17. However, having viewed Mamuszka's demeanor through this testimony and throughout the trial and in the context of the totality of evidence presented at trial, the Court notes that such testimony did not undermine the veracity of his other testimony or lend any further support to Frappier's case.

from the loan application into the system, he had no further involvement; he could not even print out the application at that point.   Thereafter, Countrywide sent the loan application to Frappier prior to the closing for him to read and verify the information included.   Countrywide then gave Frappier the application listing the same income figure at closing, where Frappier, under direction with Gendron, reviewed the application.   Therefore, for Mamuszka to have been successful in the scheme that Frappier alleges to inflate his income,[4] it would have been necessary for the underwriting department to find nothing suspect with the income figure, Frappier not read the application twice when it was provided to him, the closing attorney not to review the final loan application with Frappier at closing, and Frappier to verify blindly that application at closing.[5]

96.   At some point during the examination of Kraus and Mamuszka, counsel for Frappier inexplicable switched from contending that Countrywide's unfair or deceptive act was the inflation of Frappier's income to $5,563, but the *reduction* of the income listed on the initial application from $8,219.25 to $5,563 in the final loan document, Exh. 15, where there was no listing of his disability income.   Both witnesses testified that the reduced income was the

---

[4] Even assuming *arguendo* that Mamuszka did inflate Frappier's income, Countrywide is still not liable.   An employee cannot be an agent where he is acting against the principal's instruction and expectation.   See, e.g., Wang Labs., Inc. v. Bus. Incentives, Inc., 398 Mass. 854, 859 (1986) (so long as an employee's alleged acts fall outside the scope of his employment, the employer cannot be held liable under c. 93A).   Here, Mamuszka testified credibly that Countrywide never told him to inflate income figures and there was no evidence introduced at trial to suggest the lender did so here.

[5] At most, the loan application for the October 2006 Loan contained a typographical error as to Frappier's income.   That, however, is not a Chapter 93A violation.   Mere negligence cannot support a violation of Chapter 93A.   See, e.g., Darviris v. Petros, 812 N.E.2d 1188, 1192 (Mass. 2004) ("a violation of G.L. c. 93A requires, at the very least, more than a finding of mere negligence"); Clark v. Rowe, 701 N.E.2d 624, 629 (Mass. 1998); Blais v. Warren Five Cents Sav. Bank, No. 9218, 1993 WL 488429, at *2 (Mass. App. Div. Nov. 22, 1993).

subtraction of Frappier's disability income which was not needed to qualify for the October 2006

Loan since he qualified for it on the basis on his other income.   Even as the First Circuit and this

Court recognized that Frappier could state a c. 93A claim by alleging that Countrywide knew or

should have known that Frappier's income was inflated and, as a result, Frappier received a

mortgage that he could not afford.   How the alleged *reduction* of the income listed by Frappier

could lead to any harm to Frappier was never alleged in the complaint and never explained

sufficiently by counsel at trial or in the post-trial briefing.[6]   Tr. 2-141:9-2:144:1.

### 2.      Frappier Has Also Not Proved Any Other Basis for a Chapter 93A Claim

*97.*      Frappier raised a number of other grounds, none of which prove any unfair or

deceptive practice violating Chapter 93A.

#### a.      Initial Disclosures

*98.*      Countrywide, following its standard business practices and complying with truth in

lending disclosure laws, sent the necessary disclosures for the October 2006 Loan to Frappier after

taking his loan application by phone.   See ¶ 59, supra.   None of the evidence indicates that

Countrywide did not follow its practice here where loan file indicates that same were sent to

Frappier.   Id.   While Frappier claims he did not receive any disclosures, it is less credible that he

did not receive them and more credible, based upon his own testimony and the entirety of the

record, that he received them but did not read them.   That is, even if Countrywide failed to send

---

[6] In fact, the removal of the disability income was likely to Frappier's advantage.   The upshot of the testimony was that this social security income was removed because it was passive income requiring verification, which would have changed the loan program, thereby causing the delay Frappier was seeking to avoid.   Because Frappier stated he made more than enough base employment income to qualify for the loan under the guidelines, the disability income was removed from the application.

some initial disclosures, it would not have made any difference because Frappier testified it was his practice not to read them.  Thus, Frappier failed to prove any causation from any alleged failure to send the disclosures.

> b.    *Verification of Frappier's Employment*

99.    Nothing unfair or deceptive occurred with respect to verifying Frappier's employment.   While Frappier had alleged in the complaint that Countrywide had failed to verify this employment, there was evidence at trial that the lender did so as part of its underwriting process, in addition to relying on a borrower's sworn statement regarding employment.   Exh. 8 at CHL-FRAP000461 (CMD Quality Verification & Documentation Questionnaire (QVDQ)); Tr. 2-59:1-5.

> c.    *The Alleged Promise to Provide Future Financing is Not Actionable Under c. 93A Here Even If It Had Been Proven*

100.    To the extent Frappier is still advancing the claim that Mamuszka falsely promised to provide future financing to Frappier to bundle the loans together, this claim must also be rejected.   Before asserting a c. 93A claim, a plaintiff must send the defendant a demand letter that specifically identifies the claimed bases for c. 93A liability.   Mass. Gen. L. c. 93A, § 9; see Bressel v. Jolicoeur, 34 Mass. App. Ct. 205, 211 (1993) (denying recovery under 93A on ground not specified in demand letter, concluding that since "the demand letter makes no reference to this particular act which the plaintiff now relies upon as a violation of c. 93A. . . . her right to relief on this basis is foreclosed as a matter of law"), review denied, 415 Mass. 1101 (1993).   Because

neither of Frappier's purported c. 93A demand letters suggests some alleged promise for future financing, Frappier cannot now introduce same as a basis for c. 93A liability.

### B. Even if Frappier Had Shown Any Unfair or Deceptive Act by Countrywide, No Harm to Him was Caused by Such Action

101.   Even if the Court could somehow find that Frappier's allegations about Countrywide's unfair and deceptive acts were proven at trial, he has failed to prove—as he must—that that unfair and deceptive lending caused him damage.   Causation is a necessary prerequisite for recovery under Chapter 93A.   "In the absence of a causal relationship between the alleged unfair acts and the claimed loss, there can be no recovery [under c. 93A]."   Massachusetts Farm Bureau Fedn., Inc. v. Blue Cross of Mass., Inc., 403 Mass. 722, 730-31 (1989) and cases cited.   Here, the undisputed evidence was that Frappier made his payments on the October 2006 Loan for fifteen months.   Frappier only started having trouble making the payments after he left his employment at the Church, pursued a more lucrative job that did not pan out, after his heating bills skyrocketed, after his truck required significant repairs, and after he suffered significant health issues that precluded him from working and landed him in the hospital.   Thus, the reasonable conclusion from the evidence was that Frappier's those hardships caused his default, not the October 2006 Loan.[7]

### C.  Frappier Has Failed to Prove Unjust Enrichment to Countrywide

---

[7]Given the Court's conclusion that Frappier has failed to prove the first two elements of his c. 93A claim, namely any unfair or deceptive act by Countrywide or any harm to him as a result of same, the Court does not reach the issue of his alleged damages.

102.   The Court also enters judgment on the unjust enrichment claim in favor of Countrywide.   Unjust enrichment is not a separate claim; it is a theory of recovery.   See Lopes v. Commonwealth, 442 Mass. 170, 179 (2004) (concluding that "plaintiffs' claim of unjust enrichment does not state a separate cause of action, but a theory of recovery") (citation omitted). Moreover, Frappier's request regarding unjust enrichment, whether characterized as a claim or remedy, is not viable here.   "Unjust enrichment is defined as 'retention of money or property of another against the fundamental principles of justice or equity and good conscience.'"   Santagate v. Tower, 64 Mass. App. Ct. 324, 329 (2005) (quoting Taylor Woodrow Blitman Constr. Corp. v. Southfield Gardens Co., 534 F. Supp. 340, 347 (D. Mass. 1982)).

103.   A claim for unjust enrichment requires three elements: "(1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge by the defendant of the benefit; and (3) acceptance or retention by the defendant of the benefit under the circumstances would be inequitable without payment for its value" Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc., 552 F.3d 47, 57 (1st Cir. 2009) (citing Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts, § 68:5 (4th ed. 2003)).

104.   Frappier cannot recover for unjust enrichment where, as here, the parties' relationship was governed by a valid, legally-binding, written contract, namely the October 2006 Loan, and Frappier has a remedy at law.   See Wong v. Nieboer, No. 1626, 2006 WL 1172191, at *1 (Mass. App. Ct. Apr. 15, 2006); Rezendes v. Barrows, No. 96-01625, 1997 WL 448194, at *1 (Mass. Super. Ct. July 31, 1997).   Moreover, under any theory of recovery, it cannot be said, based upon the record at trial, that Countrywide was unjustly enriched for collecting payments

under the October 2006 Loan and then foreclosing on the Property when Frappier failed to make

such payments.   Accordingly, the Court shall enter judgment in Countrywide's favor as to Count

I.

**V.**      **Conclusion**

In light of these findings of fact and conclusions of law, the Court GRANTS judgment for

Countrywide on Count IV (c. 93A claim), and Count I (unjust enrichment claim).

**So ordered.**

/s/ Denise J. Casper
United States District Judge

41